Estate of William Block, Deceased, Charles M. Block, Administrator v. Commissioner.
Estate of Block v. Commissioner
Docket No. 68860.
United States Tax Court
T.C. Memo 1960-220; 1960 Tax Ct. Memo LEXIS 70; 19 T.C.M. (CCH) 1225; T.C.M. (RIA) 60220; October 14, 1960
*70 Held, that gifts by decedent of shares of corporate stock and of United States bonds were transfers in contemplation of death within the meaning of section 811(c)(1)(A) of the 1939 Code. The value of such gifts is accordingly includible in decedent's gross estate. Edwin P. Friedberg, Esq., 1014 Raleigh Bldg., Raleigh, N.C., for the petitioner. John L. Ridenour, III, Esq., and Paul Weiss, Jr., Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge. Respondent determined a deficiency in estate tax against the Estate of William Block in the amount of $22,926.16. The sole issue for decision is whether the values of certain shares of stock and of certain United States Government bonds transferred *71 by the decedent to members of his family approximately 21 months prior to his death, are includible in decedent's gross estate as transfers made in contemplation of death. Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with the joint exhibits identified therein, is incorporated herein by reference. William Block (hereinafter referred to as the "decedent") died intestate on August 8, 1954, at Wilmington, North Carolina. Charles M. Block, his son, was appointed administrator of the decedent's estate under letters of administration issued by the clerk of the Superior Court of New Hanover County, North Carolina, on September 3, 1954. An estate tax return was filed by the administrator on behalf of the above-named estate, with the district director of internal revenue at Greensboro, North Carolina, on October 13, 1955. Decedent was born in Riga, Latvia, in December 1878; and he emigrated to the United States at some time prior to 1900. He settled in the small community of Hermansville, Maryland, where he opened a retail store. In 1900 or 1901, he married his first wife; and the issue of this marriage was four children, whose names and ages *72 at the time of the trial in the instant case, were as follows: Name
Age
Charles M. Block
57
Nathan E. Block
54
Esther B. Guld
51
Joseph M. Block
49
Decedent and his first wife moved from Hermansville to Baltimore in the early 1900's; and he there went into business with relatives, and established a manufacturing firm known as Maryland Knitting Works, which produced underwear and other knitted garments. In the early part of the 1920's labor conditions in the Baltimore area prompted decedent to consider establishing a branch of his business in some other locality. After a trip through Virginia and North Carolina, he chose Wilmington, North Carolina, as the site for a branch factory. He selected his son, Nathan, to open the branch; and this was done in 1923. After the factory branch had been in operation for a short time, the decedent became so pleased with its possibilities that he decided to move all of his business operations from Baltimore to Wilmington. Accordingly, in 1923 or 1924, all of the equipment in decedent's Baltimore plant was moved to Wilmington. Decedent operated initially in Wilmington as a sole proprietor, trading under the name of Southland *73 Manufacturing Company. At first, the company manufactured only the products which had been produced in Baltimore; but soon thereafter shirts were added to the line. Decedent's sons were employed in the business as they became of age. Nathan ultimately took charge of the manufacturing operations; Charles acted as salesman; and Joseph took charge of purchases for the factory, spending the bulk of his time in New York. The decedent concerned himself with the financial needs of the business, and also coordinated and directed the activities of his sons. At some time or times prior to 1935, the sons were made partners with the decedent, and acquired the right to share in the profits and losses of the business. The partnership operated under the same name as the preexisting proprietorship. The record does not show when the sons were admitted to the partnership; or whether the decedent, at the time of such admission, made gifts to them of any of his capital interest; or whether the sons, upon being admitted, contributed any capital of their own. The profit and loss sharing ratios of the partners and the amounts of their capital accounts, at December 31, 1935, were as follows: Shares
in Profits
Capital
Partner
and Losses
Accounts
William Block (decedent)
50%
$ 59,911.98
Nathan E. Block
20%
37,689.99
Charles M. Block
20%
39,640.62
Joseph M. Block
10%
22,914.91
Total
100%
$160,157.50
*74 In May 1936, the partners decided to incorporate the business. As of May 31, 1936, the day before the incorporation was accomplished, the profit and loss sharing ratios of the partners had been changed; and, as of said date, such ratios, and the amounts of the capital accounts of the partners, were as follows: Shares
in Profits
Capital
Partner
and Losses
Accounts
William Block (decedent)
5%
$ 45,441.50
Nathan E. Block
40%
47,563.62
Charles M. Block
40%
47,381.83
Joseph M. Block
15%
26,191.37
Total
100%
$166,578.32 The increases in the capital accounts of the sons were due solely to the inclusion of their shares of the partnership profits for the preceding 5-month period, which were not withdrawn from the business. The decrease in decedent's capital account was due solely to his withdrawals, which were in excess of his share of the profits for said period. On June 1, 1936, Southland Manufacturing Company, Inc., was organized under the laws of the State of North Carolina; and at that time, it took over at book value all assets and liabilities of the predecessor partnership. Upon incorporation, 1,550 shares of common stock having a par value *75 of $100 per share, were issued as follows: Stock
Certificate
Number of
No.
Stockholder
Shares
Total
1
Charles M. Block
500
2
Charles M. Block
50
550
3
Nathan Block
500
4
Nathan Block
50
550
5
Joseph Block
300
6
Joseph Block
50
350
7
William Block (dece-
dent)
100
100
Total shares
1,550
The interest of the decedent in the corporation, as represented by his above shares, was approximately six per cent; whereas his interest in the capital of the partnership immediately prior to the incorporation was approximately 25 per cent. Correspondingly, the interest of each of the sons in the corporation, as represented by his shares of stock, was greater than his interest in the capital of the partnership immediately prior to the incorporation. Such increases in the sons' interests represented gifts from the decedent. The decedent filed a nontaxable gift tax return for the year 1936; but this return is not in evidence, and neither the nature nor the amounts of the gifts reported therein is established. The decedent had not filed any gift tax return for any year prior to 1936; and also, he did not file a gift tax return for any subsequent *76 year until 1952. Within 6 months after the organization of the Southland corporation, the decedent's sons, acting pursuant to a prior understanding had with the decedent, transferred a portion of their shares to their sister, Esther B. Guld. Charles and Nathan each transferred 50 shares; and Joseph so transferred 100 shares. At some undisclosed date subsequent to the corporation's original issuance of its stock, it issued additional shares to its stockholders, which represented stock purchases made by them, and also stock dividends. In December 1952, which was just prior to the transfers of shares here involved (hereinafter more particularly described), the stock of said corporation was held as follows: Percentage
No. of
of
Stockholder
Shares
Ownership
William Block (decedent)
189
6.03
Charles M. Block
1,005
32.05
Nathan Block
1,075
34.27
Joseph Block
553
17.63
Esther B. Guld
314
10.02
3,136
100.00
The Southland corporation was successful from the beginning; and at the time of the trial herein, it was one of the ten largest shirt manufacturers in the United States, having annual sales close to 5 million dollars, to retail establishments *77 through the United States and also in foreign countries. The decedent's desire, from the time the corporation was formed, was that only members of the Block family should own the stock thereof. In 1947 he had his attorney draw up an agreement between the Southland corporation and its stockholders, and also among the stockholders themselves, which provided in substance and so far as here material, that before any stockholder could dispose of any part of his Southland stock, he first had to offer the same to the corporation and the other stockholders; and that only after refusals by such offerees could the shares be sold to an outsider. This agreement was executed by the parties on October 31, 1947. Shortly after the decedent and his family moved to Wilmington in about 1924, the decedent's first wife died. In 1929, decedent remarried; but the marriage was not successful, and in 1937 he and his second wife entered into a separation agreement. Approximately 10 years later, the second wife instituted suit for divorce in a Florida state court; and she was granted a final decree of divorce in April 1948. Acting on advice of counsel, decedent did not appear in the Florida divorce proceedings, *78 either personally or by counsel. After the granting of said divorce decree, decedent entertained doubts as to the validity of the Florida divorce. There had been brought to his attention two cases where out-of-state divorce decrees based upon proceedings wherein the defendant had not appeared personally, had been refused recognition by the North Carolina courts; and he was apprehensive that his former wife, in the event of his death, might seek to set aside the divorce; and either take a widow's statutory share in his estate if he died intestate, or take such a statutory share against his will, if he died testate. Decedent, at that time, still owned approximately 6 per cent of the outstanding stock of the Southland corporation. Decedent consulted his attorney, who advised that he make gifts of his Southland stock to or for the benefit of the members of his family group. Thereupon, at a meeting of the directors and stockholders of the Southland corporation held on October 1, 1952, a resolution was unanimously adopted to waive the provisions of the above-described 1947 restrictive agreement, so as to enable the decedent to make gifts of some of his Southland shares to or for the benefit *79 of the members of his family group. Thereafter, on December 4, 1952, decedent established four irrevocable inter vivos trusts for the benefit of four of his minor grandchildren, viz.: Felice Guld, daughter of Esther B. Guld; David E. Block, son of Nathan E. Block; and Mary E. Block and Franklin L. Block, daughter and son of Charles M. Block. The Wilmington Savings and Trust Company was named trustee under each trust agreement. On December 9, 1952, decedent then transferred by gift to each of said trusts, 11 of his shares of the Southland corporation stock. And on the same date, decedent transferred outright by gift, 132 additional shares of his holdings in the Southland corporation to the following donees: Relationship
No. of
Donee
to Decedent
Shares
Nathan E. Block
Son
11
Sadie Block (wife)
Daughter-in-law
11
Frederick Block (son)
Grandson
11
Charles M. Block
Son
11
Hannah Block (wife)
Daughter-in-law
11
Esther B. Guld
Daughter
11
Moe Guld (husband)
Son-in-law
11
Howard Guld (son)
Grandson
11
Joseph Block
Son
44
132 The value of the shares at the time of all the above-mentioned gifts, as reported by decedent on his gift tax *80 return for 1952 as hereinafter shown, was $272.73 per share. The result of all the foregoing 1952 gifts, made outright and in trust, was that, on December 9, 1952, the members of the family group of each of the decedent's four children acquired, either directly or through beneficial interests, 44 additional shares of the Southland stock; and that the decedent's holdings of said stock were reduced to 13 shares, out of a total of 3,136 shares of corporate shares outstanding. Shortly prior to making the above-mentioned gifts of Southland corporation stock, the decedent borrowed, in 1952, the amount of $60,243.06 on 14 policies of insurance which he carried on his own life, and in which his four children were the named beneficiaries; and in addition, he borrowed $2,781 on another policy of insurance which he carried on his own life, in which his granddaughter Shirley B. Schulman was the named beneficiary. The total of all these borrowings was $63,024.06. The decedent then used the proceeds of these loans to purchase United States Treasury bonds, Series K, in the face amount of $64,500; and thereupon in November 1952, he transferred said bonds outright by gift, to the following donees: *81 Face
Relationship
Amount
Donee
to Decedent
of Bonds
Nathan E. Block
Son
$15,000
Charles M. Block
Son
15,000
Joseph M. Block
Son
15,000
Esther B. Guld
Daughter
15,000
Shirley B. Schulman *
Granddaughter
4,500
With respect to said gifts of bonds, decedent told each of the donees (except Shirley B. Schulman) that such donee should retain the bonds, so that the donee might be able to present a more favorable net worth statement, if it became necessary for the donees to endorse notes of the Southland corporation in connection with possible borrowings by the corporation. The values of all the above-mentioned gifts in shares of stock and in United States bonds, which decedent made in November and December 1952 (exclusive of the $4,500 gift in bonds to Shirley B. Schulman), were as reported on decedent's 1952 gift tax return: Donee or Trust
Value of Gifts
Beneficiary
In Stock
In Bonds
Total
Joseph M. Block (single)
$12,000
$15,000
$ 27,000
Nathan E. Block
$3,000
$15,000
Sadie S. Block (wife)
3,000
Frederick Block (son)
3,000
David E. Block (son)
3,000
12,000
15,000
27,000
Charles M. Block
$3,000
$15,000
Hannah H. Block (wife)
3,000
Franklin Block (son)
3,000
Mary E. Block (daughter)
3,000
12,000
15,000
27,000
Esther B. Guld
$3,000
$15,000
Moe Guld (husband)
3,000
Howard L. Guld (son)
3,000
Felice Guld (daughter)
3,000
12,000
15,000
27,000
$48,000
$60,000
$108,000
*82 The total value, per gift tax return, of all the 1952 gifts of decedent, including the above-mentioned $4,500 gift to Shirley B. Schulman, was $112,500. About 6 months later, on June 1, 1953, decedent made another gift to his daughter Esther B. Guld, consisting of 10 shares of common stock of the Block Realty Company, which had a total value of $1,000 at the date of gift. On March 16, 1953, decedent filed a Federal gift tax return for the calendar year 1952 with the district director of internal revenue at Greensboro, wherein he reported the above-mentioned gifts of Southland corporation stock and United States Government bonds, in said total amount of $112,500; and he paid the entire gift tax then due. This was the last gift tax return filed by the decedent. Decedent had discussions with the president of the bank with which he dealt regarding his estate planning. Said banking official advised decedent on tax matters. In the fall of 1949 decedent, who was then approaching 71 years of age, consulted a physician, Willam J. Wilson, M.D., who specialized in orthopedics, and complained that for the previous three years he had been suffering pain in his legs and other joints of his *83 body, and had difficulty in walking. This physician had decedent admitted to a hospital; and the physical examination there made of the decedent revealed "an obese elderly man with * * * pitting edema of both lower extremities * * * [who] walks with a peculiar shuffling gait very suggestive of central nervous system damage." The doctor's primary diagnosis of decedent's ailment was "cerebral vascular accident" (the lay term for which is a "stroke"), and his secondary diagnosis was "arteriosclerotic heart disease." The above physician also called in for consultation another physician, Robert B. Rodman, M.D., who specialized in internal medicine. Rodman thereupon made an examination; and his diagnosis was that decedent had sustained severe damage to his heart, and was suffering cogestive heart failure, brought on by arteriosclerosis and a consequent weakening and dilation of the heart muscles. Rodman discussed these ailments with the decedent. The decedent left the hospital after three days, and returned to his home. He was, at that time, the comptroller of the Southland corporation and also the chairman of its board of directors; and, although he had difficulty in walking, he continued *84 to be driven to his office in the Southland plant, on an almost daily basis, until late in 1952. Thereafter his trips to the office became less frequent, and they ceased in 1953, at which time he also gave up the comptrollership. While at the office, decedent signed checks, approved invoices, investigated the credit of customers, and wrote collection letters to customers having overdue accounts. Also, in 1951, decedent made three trips to New York to confer with his son, Joseph, about purchases of material for the plant. It was the custom of the Southland corporation up to and including the year 1952, to give an annual party for its employees at Christmas time. Decedent attended these parties every year through 1952. In 1951, because of decedent's difficulty in locomotion, he hired a manservant who stayed with him during the daytime hours and acted as a combination of houseboy, chauffeur and orderly. This attendant helped decedent to move about and to get in and out of the car. Also in 1951, a practical nurse was hired to stay with decedent from the hours of 7 p.m. to 7 a.m. The nurse also helped decedent to get about; brought food to him, helped him to undress when he retired; *85 and acted as a companion to him. From late in 1951 until February 1954, the nurse for her protection and convenience, used a wheel chair in taking decedent from place to place in the house; but decedent was not totally confined to the wheel chair during that time. The wages paid to the manservant and to the nurse were deducted as medical expenses, on decedent's income tax returns for the years 1952 and 1953 and on the income tax return filed on behalf of his estate for 1954. Decedent was a very religious man. Up until September 15, 1951, he walked almost every Friday evening and Saturday morning 16 blocks to and from the synagogue of which he was a member. He, however, was compelled in the fall of 1951 to give up attending the synagogue, because he was having difficulty in walking, and his religious beliefs forbade riding in a vehicle on the Sabbath Day. He continued, however, to read and study the Bible, regularly and frequently. In March 1954, decedent suffered a rather severe coronary thrombosis which paralyzed his right arm and right leg. Ten days later, he was able to be taken out of his bed, but thereafter he was confined to a wheel chair. His mental faculties began to deteriorate *86 and he was no longer the alert, cheerful, witty and forceful individual that he had been up until the coronary attack. In July of the same year, decedent required medication for a cold and fever; and he appeared to respond favorably to the treatment. His doctor recommended that the family take decedent to a cottage on the seashore, and this was done. A few days thereafter, decedent suffered a relapse, and he was then brought back to Wilmington and admitted to a hospital on August 3, 1954. Five days later, on August 8, death came to William Block, in his 76th year. The immediate cause of death was hypostatic pneumonia, and the antecedent cause was generalized arteriosclerosis. On the Federal estate tax return which was filed for the decedent's estate, the value of the decedent's gross estate was reported to be $102,071.62. The administrator disclosed in this return the above-mentioned 1952 and 1953 gifts aggregating $113,500, but he did not include any of such gifts in the gross estate. The respondent, in his notice of deficiency herein, determined that all of the abovementioned 1952 and 1953 gifts of the decedent, consisting of the Southland corporation stock, United States Government *87 bonds, and Block Realty Company stock, were transfers made in contemplation of death. He included all of the same in the decedent's gross estate at a value of $113,900, and then allowed a credit for the amount of the gift tax which the decedent had paid with respect to his 1952 gifts. Based on such adjustment respondent determined the deficiency here involved. It has now been stipulated that the total value of the gifts made by the decedent during 1952 and 1953 was $113,900. The 1952 and 1953 transfers were made in contemplation of death. Opinion The essentially factual issue here presented is whether the gifts of shares of corporate stock and of Government bonds which the decedent made to members of his family within approximately 21 months prior to his death, were transfers in contemplation of death. If they were such, then the undisputed values of said gifts were properly included by the respondent in the decedent's gross estate, under the provisions of section 811(c)(1)(A) of the Internal Revenue Code of 1939. [1]Section 811(1) provides in material part that: "If the decedent within a period of three years ending with the date of his death * * * transferred an interest in *88 property * * * such transfer * * * shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of" section 811(c). Accordingly, there is a rebuttable statutory presumption in the instant case that decedent's transfers here involved were made in contemplation of death; and the burden is on the petitioner-estate to show otherwise. In the leading case of United States v. Wells, 283 U.S. 102, the Supreme Court, in an opinion by Mr. Chief Justice Hughes, discussed at considerable *89 length the meaning of the phrase, "contemplation of death"; and thereafter, many of the conclusions set forth in said opinion were embodied in the Treasury Regulations. Section 81.16(a) of Regulations 105 which are here applicable, states in part as follows: The phrase, "contemplation of death," as used in the statute, does not mean, on the one hand, that general expectation of death such as all persons entertain, nor, on the other, is its meaning restricted to an apprehension that death is imminent or near. A transfer in contemplation of death is a disposition of property prompted by the thought of death (though it need not be solely so prompted). A transfer is prompted by the thought of death if it is made with the purpose of avoiding the tax, or as a substitute for a testamentary disposition of the property, or for any other motive associated with death. The bodily and mental condition of the decedent and all other attendant facts and circumstances are to be scrutinized to determine whether or not such thought prompted the disposition. When decedent made the 1952 and 1953 gifts here involved, he was approximately 74 years of age; he had been in ill healtl *90 for more than 3 years; and his condition was deteriorating. He had been compelled to give up attending the synagogue; his trips to the office had been curtailed; it was necessary for him to have the services of attendants during both day and night (the cost of which services was deducted as medical expense on his income tax returns); and he was having to use a wheel chair, although he was not totally confined thereto. His physician had, about 3 years earlier in 1949, found him to be a chronically ill man, and had discussed with him at that time the deteriorating state of his health. This same physician testified that decedent's bodily condition was such that "he would certainly know that something had gone wrong"; and he further testified that decedent "was apprehensive and very much concerned with the implications of his illness." Another concern of decedent, at the time when he made the gifts here involved, was that the divorce obtained by his second wife might not be given recognition by the North Carolina courts; and that such former wife might claim an interest in the assets of his estate. He had discussed this problem with his attorney; and the latter had advised him to make *91 gifts from his shares of Southland stock to or for the benefit of members of his family. See, in this connection, In re Kroger's Estate, (C.A. 6) 145 F. 2d 901, affirming a Memorandum Opinion of this Court. The gifts involved were all made within approximately 21 months prior to decedent's death. Their undisputed total value was $113,900, as compared with a lesser value of approximately $102,000 which remained in decedent's gross estate at the time of his death. Thus the gifts represented more than half of the amount which would otherwise have been includible in his gross estate. Sixty thousand dollars of the 1952 gifts were obtained by the decedent through loans made from insurance policies carried on his life, of which his four children were the beneficiaries. Except for these gifts, said insurance policies would have been includible in decedent's estate, without reduction for the amount of the loans. All of the gifts involved were made to the natural objects of decedent's bounty; and the amounts thereof, as we have heretofore found, were equalized with almost mathematical precision among his children's family groups. The evidence discloses that each of the children *92 already had considerable wealth; for example, considering their holdings of Southland stock alone, Charles M. Block had 1,005 shares, Nathan Block had 1,075 shares, Joseph Block had 553 shares, and Esther B. Guld had 314 shares - and the value of this stock at the time of the gifts was in excess of $272 per share. See in this connection, Updike v. Commissioner, (C.A. 8) 88 F. 2d 807, affirming a Memorandum Opinion of this Court. There is no evidence of decedent having made any gifts to members of his family for a preceding period of 16 years - since 1936. The gifts here involved, therefore, can not be regarded as being a mere continuance of a previously initiated plan of making gifts to decedent's children and the members of their families. After considering and weighing all the evidence, including that pertaining to the facts above mentioned, we are impelled to conclude that the gifts here involved were made in contemplation of death. In reaching this conclusion we have not overlooked the facts: That decedent was not totally incapacitated; that he was a cheerful, generous, and very religious man; and that he undoubtedly did obtain gratification from the making of *93 the gifts. But these factors are, in our view, insufficient to overcome the cumulative weight of the more compelling factors which we have above set forth, or to rebut the statutory presumption imposed by section 8111). We decide the issue in favor of the respondent. In order to permit the parties to compute the amount deductible by the estate for the reasonable costs of prosecuting this appeal, Decision will be entered under Rule 50. Footnotes
*. Shirley B. Schulman was the daughter of the decedent's first wife's daughter by a prior marriage.↩
1. SEC. 811. GROSS ESTATE. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States - * * *
(c) Transfers in Contemplation of, or Taking Effect at, Death. - (1) General rule. - To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise - (A) in contemplation of his death; * * *↩